

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-30-2002

# DE River Stevedores v. Director OWCP

Precedential or Non-Precedential:

Docket 1-1709

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"DE River Stevedores v. Director OWCP" (2002). *2002 Decisions*. Paper 74.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/74

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 30, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1709

DELAWARE RIVER STEVEDORES, INC.,
Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,
AND SOUTHERN STEVEDORES, INC.,
Respondents.

On Petition for Review of Order and Opinion of the
Benefits Review Board dated March 12, 2001
entered in Agency Nos. 00-691 and 00-691A

Argued December 18, 2001

Before: SLOVITER and McKEE, Circuit Judges, and
DEBEVOISE, District Judge.*

(OPINION FILED: January 30, 2002)

Stephen M. Calder, Esq. (Argued)
Palmer Biezup & Henderson LLP
620 Chestnut Street, Suite 956
Philadelphia, PA 19106
Attorneys for Petitioner

_____

* Honorable Dickinson R. Debevoise, United States Senior District Judge
for the District of New Jersey, sitting by designation.

          Eugene Mattioni, Esq. (Argued)
          Mattioni, Ltd.
          399 Market Street, 2nd Floor
          Philadelphia, PA 19106
          Attorneys for Respondents

OPINION OF THE COURT

DEBEVOISE, Senior District Judge:

This is a petition for review of an order and opinion of the Benefits Review Board (the "Board") which reversed the finding of the Administrative Law Judge ("ALJ") that Respondent, Southern Stevedores, Inc. ("SSI") is the employer responsible for the benefits awarded to claimant James Loftus for his back injuries. We conclude that the findings of the ALJ were not supported by substantial evidence and will deny the petition for review.

I. The Facts

Loftus had worked as a longshoreman since 1974. Although he suffered several workplace injuries before he commenced working for SSI in 1996, none affected his back. At SSI Loftus worked as a 40-foot trailer mechanic and inspected, repaired and overhauled gensets. Gensets were generators that were mounted under the bellies of trailer chassis. Loftus described trailer maintenance and repair as follows:

> A. Well, if the landing gear gets broken off, you've got to cut it off and put a new set on, reweld it and everything. If an air valve's broke, you got to take it off, unhook all the hoses under the trailer to get a new air -- to get the valve off and replace a new valve and put the hoses back under the trailer. You also pull the big black tires, two at a time, to do a brake job. And the springs that hold those brakes on aren't very lightly stretched.

(App. at 99).

2

A substantial part of Loftus's work consisted of repairing and maintaining gensets. Although management expected that it would take seven and one half hours to repair a genset, Loftus and his teammate developed the ability to accomplish the task in four hours or less. He described his work on the genset:

> Q. How did you have to either repair or maintain a genset at Southern in the period between January to September of 1996?
>
> A. Well, we had to sit on a stool, Your Honor, it's a little mechanic's stool . . .
>
> Q. What's a mechanic's stool?
>
> A. . . . and it measures exactly one foot off the floor. It's a little stool with four wheels on it and you could roll around. Now where the genset was mounted on the trailer is very low. I'm already down a foot off the floor and I have to stick my head in that hole to get to that engine and do what I had to do. And I would be bent over constantly one foot from the floor.
>
> Q. How many men do this job?
>
> A. Basically, it was me and Kevin Doyle.
>
> Q. When you're doing this, my point, do you get two men working on the same genset?
>
> A. Well, I would be on this side. I would take the side where the starter and the alternator and everything was and this would be the trailer. And Kevin Doyle would be on that side where he would drain the oil and change the oil filters and work on the control panel, which was up a little higher than the side that I worked on.

(App. at 99-100).

After performing this work for a number of months Loftus began to have trouble with his lower back. In September 1996 he went to his family doctor who prescribed pain relieving drugs and, because it was a work related problem, advised him to seek medical care through his employer. SSI referred Loftus to Michael J. Mandarino, M.D., P.C. who

3

examined Loftus on or about October 11. Dr. Mandarino reported that Loftus complained of discomfort up and down the spine and across the low back but denied arm or leg radiation of discomfort. He concluded that the complaints were consistent with a sprain and strain and advised Loftus to exercise, swim as much as possible during an approaching Florida vacation, to continue taking his oral medication and to return for reevaluation in two weeks.

On December 9 and 16 Loftus returned to Dr. Mandarino for tests and reevaluation. Loftus had had a CT scan, a bone scan and MRI scan, all of which were normal. On December 16 Dr. Mandarino noted that "On examination today the patient has full motion of the lumbar spine. Straight leg raise is negative. No neurological deficit are noted at this time nor has there ever been any neurologic deficit. It has been explained to Mr. Loftus that all of the diagnostic studies are normal. He feels that he is capable of returning to work." (App. at 32).

Dr. Mandarino stated that Loftus could return to work full duty without restriction the following day-- December 17, 1996. Loftus did in fact return to work, and SSI made substantial adjustments in its work practices to relieve the pressures on Loftus's back. As Loftus described it:

> A. Well, the trailer came up higher off the floor and everything. And then the trailer came up, the genset came up, everything was up high. We had – – they bought a hydraulic jack, we put it in the back. We raised the back. And they had two big twelve–by–twelve chocks that we would put under the landing gear. And everything came from this high on the floor to where, you know, where you could sit and work in there. You didn't have to stick your head in, you know, you weren't bent over like this anymore.
>
> Q. Did you still have to use that one footstool?
>
> A. No, they had chairs just as high as this here. You could raise the chair and lower the chair. It had a back on it.

(App. at 109–110).

4

Loftus returned to Dr. Mandarino on April 25, 1997 reporting that since the December visit "the job itself and the overall conditions of his job have been improved tremendously" but that "over the last few weeks there has been a gradual recurrence of discomfort in the spine." (App. at 32). On examination of the lumbar spine Dr. Mandarino found discomfort on motion. Straight leg raising was negative. No neurological deficits were noted in the lower extremities. Loftus was started on Medrol-dospak and advised to return in three days for reevaluation.

Loftus returned to Dr. Mandarino for reevaluation on April 28 and May 2, 1997. Dr. Mandarino found that none of the tests nor his examination would explain Loftus's disabling pain. After explaining this to Loftus, Dr. Mandarino cleared him orthopedically to return to full duty without restriction. Dr. Mandarino advised him to have a physical with his family doctor to see if there were any nonwork related etiology for his discomfort and discharged him from his care.

On May 14, 1997 Loftus went to Dr. Gad Guttman, senior orthopedic surgeon at the Department of Orthopedic Surgery at Albert Einstein Medical Center, for a second opinion. Dr. Guttman reviewed Dr. Mandarino's records reflecting the absence of radiculopathy, Loftus's return to work on December 17, 1966, the recurrence of back pain in April, 1997 and Dr. Mandarino's conclusion that from an orthopedic standpoint Loftus was cleared to return to full duty. Dr. Guttman also reviewed the December 12, 1996 report of the radiologist reflecting Loftus's return to work on December 17, 1996, the recurrence of back pain in April 1997 and Dr. Mandarino's conclusion that from an orthopedic standpoint Loftus was cleared to return to full duty. Dr. Guttman also reviewed the December 12, 1996 report of the radiologist reflecting that an MRI showed mild degenerative changes of discs 3-4 and 4-5 and mild bulging without disc herniation or foraminal stenosis. These findings, Dr. Guttman stated, were confirmed by the December CAT scan and bone scan, all of which "were consistent with the findings of degenerative changes of the lumbar spine which one would expect in a patient in this type of work, with this habitus and weight and so on." (Supp. App. at 48).

5

Dr. Guttman took Loftus's history and performed a physical examination. During his testimony Dr. Guttman was asked whether he had an opinion as to whether Loftus's complaints emanating from October of 1996 had closed when he saw him in May of 1997. Dr. Guttman responded:

> I felt that at the time that I examined him the patient's complaints were related more to his overweight, to his overexertion and to the underlying degenerative changes. He kept working all the time and it was not unusual to have pain coming and going after such heavy work and he was in pretty bad overall condition anyway. When I saw him he was overweight and he had degenerative changes.
>
> So as far as the specific question, in I believe 1996 his symptoms started acutely. Then they resolved in December of `96 I believe according to Dr. Mandarino's report. He returned back to work. Then he kept on working and after four months or so he started having pain again. I called it overexertion and deconditioning and underlying degenerative changes.

(Supp. App. at 54).

Because his back was hurting Loftus had taken time off from his work from April 25 to May 4, 1997. He saw Dr. Guttman on May 14 and took time off from work from May 8 to May 18. On or about May 18 he returned to work full time. His back still caused him discomfort and to relieve the pain he commenced seeing a chiropractor, Dr. Izzo on July 16, continuing with him until September 12, 1997 when his insurance coverage expired. Dr. Izzo provided relief through ultrasound, a TENS device, heat packs and stretching.

At the end of August 1997 petitioner, Delaware River Stevedores, Inc. ("DRS") acquired SSI's interest in the facility at which Loftus worked. DRS acquired SSI's equipment including the special equipment that had been designed for Loftus to relieve his back problems. Operations at the facility continued as before and the nature of Loftus's work did not change after August of 1997.

6

In the four month period January through April 1998 Loftus worked an extraordinary number of overtime hours, ranging on many days from ten to eleven hours and on others from seventeen to eighteen hours. On one day he worked twenty-one hours. The demands placed upon the stevedoring company to move incoming cargoes of fruit was the reason for DRS's heavy time demands imposed on its mechanics.

By April 1998 Loftus's back was again causing him serious pain. He was referred to Roy T. Lefkoe, M.D., P.C. The referral letter from Branch Manager, presumably of DRS's claims adjuster, Neil J. Davis stated: "We are particularly interested in having you take a complete history from the claimant, to determine whether or not his recent complaints are the result of a new injury with his present employer, Delaware River Stevedores, or if they are attributable to the old accident of September 30,[1996]":**

Dr. Lefkoe saw Loftus for an orthopedic consultation on May 20, 1998. He reviewed Loftus's medical records and took a history from Loftus, who reported that "[i]n 4/98 his pain worsened without additional injury" (App. at 38). Loftus reported low-back pain radiating into both legs.

Dr. Lefkoe conducted a physical examination. His diagnosis was acute and chronic lumbosocral strain/sprain and lumbar degenerative disc disease at L3-4 and L4-5 with bulging discs. He found Loftus to be in acute pain and unable to continue working. He prescribed medication and physical therapy to include aquatherapy, modalities and exercise. As to the question Davis addressed to him, he stated, "Based on all information available to me, the cause of his present back condition still is the original work injury of 9/30/96." (App at 40).

Loftus did not return to work; rather he continued seeing Dr. Lefkoe and proceeded with physical therapy. Dr. Lefkoe received a July 9, 1988 report of neurologist Steven Mandel, M.D., who stated, ". . . this gentleman appears to

_____

** The letter (App. at 36) referred to September 30, 1990, but undoubtedly the author intended to refer to September 30, 1996, and Dr. Lefkoe so understood it.

7

have complaints consistent with a diagnosis of lumbar radiculopathy. There is evidence of chronic changes and the L5 and S1 distribution without evidence of any significant acute changes noted. There are only mild changes noted in his right lumbar paraspinal muscles at the L4-5 and L5-S1 area." (App. at 47). Dr. Lefkoe prescribed medication and referred Loftus to Dr. Sandra Kahn for injections. None of this provided relief, and Loftus was referred to Dr. Rosen in November, 1998. Dr. Rosen administered a series of six epidural injections which had a beneficial effect. Loftus testified that Dr. Rosen's treatment "brought me back" to the extent that "I never knew anything was wrong with me. It was so good." (App. at 122).

Loftus was able to return to work with DRS in January 1999 with restrictions. He was not called upon to go underneath the trailers. He usually wore a TENS unit and occasionally took pills to relieve pain. He worked only eight hour shifts and performed no overtime.

Dr. Guttman, who had reported on Loftus's condition after his work cessation in April 1997 saw him again in June of 1998, about five weeks after he had ceased work because of increased pain and after Loftus had come under the care of Dr. Lefkoe. He saw him again in August 1998. Dr. Guttman testified that Loftus was in greater pain than when he had seen him the previous year. Dr. Guttman was referred to the records showing Loftus's longer hours during the months preceding May of 1998. He testified:

> Basically they showed that he did quite a lot of overwork and in those months, I believe January through April, he did extremely heavy long-time work, what I call overwork, and that in itself I believe can explain why he had this onset of pain after he was already working there, but during those four months he really worked extremely heavy and I believe that that could explain his pain when I saw him again which was a little bit worse in intensity than the one that he had before.

(Supp. App. at 58).

Dr. Guttman was directed to assume that Loftus worked unusually long hours in January, February, March and

8

April 1998 and was asked if he had an opinion as to the cause of Loftus's back pain in April and May of 1998 through the time he saw him in August 1998. Dr. Guttman responded:

> Well, the information you give me I was also privy to review before. It just amplifies my impression that there was an exertion of work. He worked much more than the normal person would work in a day's session, almost twice as much sometimes, and that was certainly very stressful for his back. So the symptoms that he reported to me and came to me was of being similar were much worse and intense when I saw him in June of `98 than compared to the ones that I saw him in April of `97 at which time he had hardly any symptoms and, in fact, I felt he could go back to work without problems. I didn't feel so when I saw him in`98 and explanation for that, he over exerted himself. He stressed his back at work over time and that was the cause of his problems and it was ongoing.

(Supp. App. at 65-66).

As recited above, after Dr. Guttman's August examination Loftus continued medical treatment and physical therapy and was able to return to work on a restricted basis in January 1999.***

II. Administrative Proceedings

In August 1999 the ALJ heard Loftus's claim for workers compensation benefits under the Longshore and Harbor Workers' Compensation Act, as amended 33 U.S.C.S 901, et seq. (the "Act"). The parties to the proceeding were the claimant, Loftus; the earlier employer, SSI; and the subsequent employer, DRS. Of the four issues before the ALJ, only one is the subject of the present appeal, i.e.,

_____

*** The portion of the testimony of Dr. Bong Lee included in the record contributes little to resolution of the principal issue in this case. In Dr.
Lee's opinion the cause of Loftus's disability was not due to a work incident or symptoms in September 1996 but is due to his pre-existing back condition. This pre-existing back condition would also be the cause of each subsequent flare up. (Supp. App. 15-76).

9

"[w]hich of the named Employers is responsible for any compensation benefits awarded."****

SSI asserted that Loftus suffered no work related disability as a result of work Loftus performed for it but that Loftus suffered a naturally occurring degenerative spinal condition pre-existent to the September 1996 manifestation of low back pain therefrom. Alternatively SSI asserted that if Loftus was rendered disabled by work related causes, such disability arose as the result of a separate and discrete event of work overexertion while in the employ of DRS between January and April 1998, thus placing liability for compensation benefits upon DRS as of the May 20, 1998 manifestation of low back pain and thereafter.

DRS adopted SSI's first contention and alternatively urged that if Loftus were disabled from work activity, it was his work activity at SSI, first manifested by pain in September 1996 which exclusively placed liability for compensation benefits solely upon SSI.

The ALJ rejected SSI's and DRS's first argument and concluded that Loftus was entitled to compensation for total temporary disability for the periods sought. As between SSI and DRS he found that SSI was the employer responsible for all benefits awarded, stating:

> I find that the record evidence establishes that Southern is the employer responsible for benefits awarded herein. First, there is no evidence that Claimant suffered from a severe back injury or impairment or from back pain prohibiting his work prior to the September 30, 1996 manifestation of low back pain (See Tr. 25, 62). Second, Claimant's back problems and same complaints of back pain persisted throughout the time period subsequent to September

_____

**** In addition the ALJ had to determine i) whether Loftus was entitled to compensation for total temporary disability for the intermittent periods he was out of work between September 30, 1996 and January 21, 1999, ii) whether Loftus was entitled to compensation for temporary partial disability (loss of wage earning capacity) after January 21, 1999 and iii) Loftus's average weekly wage underlying any compensation benefits awarded.

10

30, 1996 up to the present (Tr. 46; 105–6; 112–13). And Claimant promptly reported this back pain to his foreman at that time (Tr. 31). Finally, the more probative medical and lay evidence otherwise establishes that Southern is the employer responsible for benefits.

(App. at 17).

In half a page the ALJ marshaled the evidence he believed supported his conclusion. He rejected SSI's contention that but for the four month period of intensive work Loftus would not have been disabled after late April 1998 on the ground that "but for the initial (September 30, 1996) manifestation of back symptoms, Claimant would not have suspended his work activities after the April–May, 1998 symptom flare-up". (App. at 17).

The ALJ attached the greatest weight to Dr. Lefkoe's May 20, 1998 opinion that Loftus's back condition in April–May 1998 was caused by the original work injury of September 30, 1996. The ALJ further stated that Dr. Lefkoe's deposition testimony "repeats this conclusion even more firmly." (Id.)

The ALJ acknowledged that "the episode of extra heavy work exertion while Claimant was employed at DRS in January through April 1998 may well have furthered his low back pain," but he went on to state that "the initial precipitant event of symptom manifestation on September 30, 1996 was the discrete event which ultimately eventuated and progressed to the final debilitating event of late April – May, 1998 requiring the suspension of work activity (and later necessitating the January, 1999 return to work at only a light daily job)." (Id.)

SSI appealed to the Board the Decision and Order of the ALJ finding it to be the responsible employer for the period of temporary total disability from April 21, 1998 to January 20, 1999. The Board concluded that the ALJ applied erroneous legal principles and held that as a matter of law DRS is liable for Loftus's temporary total disability benefits for the period from May 1998 to January 20, 1999.

The Board held that "[a]lthough the employer at the time of an initial traumatic injury remains liable for the full

11

disability resulting from the natural progression of that injury, if claimant's subsequent employment aggravates or accelerates claimant's condition resulting in disability, the subsequent employer is fully liable." (App. at 4). Phrased somewhat differently the Board also held the law to be that "where claimant's work results in a temporary exacerbation of symptoms, the employer at the time of the work events leading to this exacerbation is responsible for the resulting temporary total disability." (App. at 4).

The Board found that the undisputed evidence established that Loftus's employment with DRS, which included the four months of lengthy overtime, aggravated Loftus's symptoms, resulting in increased pain. This evidence included Dr. Guttman's, Dr. Lefkoe's and Dr. Lee's opinions to that effect.

The Board held that the ALJ misapplied the law in that the test was not, as the ALJ ruled, that Loftus"sustained a work-related injury on September 30, 1996, and/or that his continued work activity aggravated his low back impairment." (App. at 5).

The Board further held that the ALJ misapplied the law in holding that it was determinative that "the initial precipitant event of symptom manifestation on September 30, 1996 was the discrete event which ultimately eventuated and progressed to the final debilitating event of late April-May 1998 requiring the suspension of work activity." (App. at 5).

Based on what it found to be errors of law the Board reversed the ALJ's finding that SSI is liable for Loftus's period of temporary total disability benefits from May 1998 to January 20, 1999, holding that DRS is the responsible employer for this period of disability as a matter of law.

III. Discussion

We have jurisdiction of the petition to review the Board's final order by virtue of Section 21(c) of the Act, 33 U.S.C. S 921(c).

Under the Act the Board is obligated to treat the ALJ's findings of fact as "conclusive if supported by substantial

12

evidence in the record considered as whole." 33 U.S.C. S 921(b)(3). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corporation v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456(1951).

In reviewing the Board's decision this court must ascertain i) whether the Board adhered to the applicable scope of review, ii) whether the Board committed any errors of law, and iii) whether the ALJ's findings are supported by substantial evidence on the record as a whole. Crum v. General Adjustment Bureau, 738 F.2d 474, 477 (D.C. Cir. 1984).

Both SSI and DRS agree that the law governing the responsible employer in the case of multiple traumatic injuries is set forth in Buchanan v. International Transportation Services, 33 BRBS 32 (1999), aff 'd mem., No. 99-70631 (9th Cir., Feb. 26, 2001). There the Board stated:

> In determining the responsible employer in the case of multiple traumatic injuries, if the disability results from the natural progression of an initial injury and would have occurred notwithstanding a subsequent injury, then the initial injury is the compensable injury and accordingly the employer at the time of that injury is responsible for the payment of benefits. If, on the other hand, the subsequent injury aggravates, accelerates, or combines with claimant's prior injury, thus resulting in claimant's disability, then the subsequent injury is the compensable injury and the subsequent employer is fully liable.

Id. at 35.

This is the law that the Board applied. It noted, correctly, that "[i]f the conditions of a claimant's employment cause him to become symptomatic, even if no permanent harm results, the claimant has sustained an injury within the meaning of the Act." The Board further noted, correctly, that "where claimant's work results in a temporary exacerbation of symptoms, the employer at the time of the

13

work events leading to this exacerbation is responsible for the resulting temporary total disability." (App. at 3).

Kelaita v. Director, OWCP, 799 F.2d 1308 (9th Cir. 1986) is illustrative of the application of these principles and bears a close parallel to the present case. The claimant in that case suffered from a continuing shoulder rotator cuff tear. He suffered a flare-up of pain which interrupted his work while employed at Triple A. He voluntarily quit Triple A in December 1974 and commenced work as a machinist at General Engineering. There he suffered another work interrupting flare-up of his arm. He filed two claims for compensation. In the first he alleged cumulative trauma injury to his right shoulder during employment at Triple A. In the second he alleged an identical injury during his employment at General.

The ALJ found that the claimant's disability resulted from continued use of his arm and that each flare-up of pain represented cumulative trauma and aggravated the underlying injury, resulting in each case in a compensable injury.

The Court of Appeals sustained the ALJ's conclusion that because General was the employer during the most recent aggravation, it should be held liable for the disability stating:

> The last responsible employer rule is applied to two-injury cases as follows:
>
> If, on the other hand, the [subsequent] injury aggravated, accelerated or combined with claimant's prior injury, thus resulting in claimant's disability, then the [subsequent] injury is the compensable injury, and [the subsequent employer] is . . . responsible . . .

700 F.2d at 1311 (quoting Crawford v. Equitable Shipyards, Inc., 11 BRBS 646, 649-50 (1979), aff 'd sub nom. Employers National Ins. Co. v. Equitable Shipyards, 640 F.2d 383 (5th Cir. 1981)).

The facts in the present case are almost identical to those dealt with in Kelaita except that the underlying injury resulting in periodic flare-ups involved Loftus's continuing back condition rather than a continuing shoulder

14

condition. All the medical evidence confirmed that Loftus suffered from chronic lumbar degenerative disc disease. This resulted in two distinct flare-ups or injuries. The first culminated in late September 1996 when the back pain became so intractable that Loftus had to stop work and undergo diagnosis and treatment. He recovered sufficiently to return to work in December 1996. The underlying lumbar degenerative disc disease persisted as was to be expected, requiring Loftus to resort to various remedies from time to time to alleviate pain. However, he was able to continue work, with occasional absences, through all of 1997 and on until May 1998 when he suffered another flare-up, more serious than the first. The flare-up required extensive treatment and Loftus was unable to return to work until January 1999.

It is DRS's contention that this was merely a natural progression of the original injury rather than the result of employment that aggravated or accelerated Loftus's condition resulting in disability. The ALJ, as the Board pointed out, did not address head-on the critical issue whether the May 1998 episode aggravated or accelerated claimant's condition. Rather his general findings suggested that he was relying on erroneous legal principles and his finding that Loftus's May 20, 1998 back condition was caused by the original work injury of September 30, 1996 was unsupported by any evidence.

The ALJ gave a number of reasons for finding that SSI is the employer responsible for benefits. He stated that there is no evidence that Loftus suffered from a severe back injury or impairment or from back pain prohibiting his work prior to the September 30, 1996 manifestation of low back pain and that "the initial precipitant event of symptom manifestation on September 30, 1996 was the discrete event which ultimately eventuated and progressed to the final debilitating event of late April-May 1998." (App. at 17).

As the Board pointed out in its decision, however, "[t]he fact that the earlier injury was the `precipitant event' is not determinative." (App. at 5). The determinative question is whether Loftus's subsequent work aggravated or exacerbated Loftus's condition first manifested in September 1996.

15

Even the ALJ's own opinion concedes there was an aggravation of the September 1996 injury. In the section in which he awarded Loftus temporary total disability he found a work-related injury on September 30, 1996"and/or that Loftus's continued work activity aggravated  his low back impairment" and that this conclusion was"amply and preponderantly medically demonstrated in this record." (App. at 16) (emphasis added). Further, the ALJ refers to the April-May "flare-up" and concedes that"the episode of extra heavy work exertion while claimant was employed at DRS in January through April 1998 may well have furthered his low back pain, the initial precipitant event, etc. . . ." (App. at 17).

The only medical evidence that might support an inference that the May 1998 flare-up was a continuation of the September 1996 flare-up is an opinion stated in Dr. Lefkoe's May 20, 1998 report after he had first examined Loftus in connection with the May 1998 flare-up. He opined "[b]ased on all information available to me, the cause of his present back condition still is the original work injury of 9/30/96." (App. at 40).

The ALJ said that Dr. Lefkoe's opinion is "the medical evidence to which I attach the greatest weight." (App. at 6).

In Dr. Lefkoe's deposition testimony, however, he conceded that Loftus had not informed him of the extraordinary number of hours he had worked during the January through April 1998 period.

> Q. Did he advise you that he was working a great deal of overtime sometimes 15, 16, 18 hour days?
>
> A. No, I was not aware of that . . . He just told me that in April of 1998, his pain worsened without any specific identifiable injury. . . That could have aggravated his condition.
>
> Q. That would be aggravating his condition?
>
> A. That's correct.

(Supp. App. at 16-17).

After being referred to Loftus's testimony concerning his long hours during the fruit season, Dr. Lefkoe testified:

        Q. If that's true, can we agree that that heavy work
        aggravated his preexisting back problem?

        A. I think that that certainly could have aggravated
        his preexisting back problem. (emphasis added)

(Supp. App. at 36).

Thus, given full information, Dr. Lefkoe discarded the
May 20, 1998 opinion upon which the ALJ relied and
revised it to express the view that Loftus's January – April
1998 working conditions "certainly could have aggravated
his preexisting back problem." His opinion in this respect
was consistent with the opinions of the other medical
experts, Dr. Guttman and Dr. Lee.

IV. Conclusion

The ALJ applied incorrect principles of law, and his
finding that the May 1998 flare–up was simply a
continuation of the September 1996 flare–up was not
supported by substantial evidence.

We will deny the petition to review the Board's reversal of
the ALJ's finding that SSI is liable for the May 1998 to
January 20, 1999 period of benefits and to review the
Board's holding that DRS is the responsible employer for
this period of disability as a matter of law.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

17